IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                         1:17-cr-3338-JMC

MILTON BOUTTE,
JOE DIAZ,
ARTURO VARGAS,
and GEORGE LOWE,

       Defendants.

## <u>ORDER DENYING DEFENDANT MILTON BOUTTE'S RENEWED MOTION FOR A JUDGMENT OF ACQUITTAL AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT</u>

On July 11, 2022, Defendant Milton Boutte ("Boutte") filed a Renewed Opposed Motion for a Judgment of Acquittal and Motion for Judgment Notwithstanding the Verdict (Doc. 346).  In the motion, Boutte contends no evidence corroborates co-Defendant George Lowe's testimony and the evidence necessarily raises doubt for the jury, requiring the Court to acquit Defendant.  For the reasons set forth below, the Court denies Boutte's Renewed Opposed Motion for a Judgment of Acquittal and Motion for Judgment Notwithstanding the Verdict.

I.     <u>Background</u>

Boutte headed the Big Crow Program Office ("BCPO") at Kirtland Air Force Base in Albuquerque, New Mexico.  BCPO, in turn, functioned as the airborne component of the United States Army's electronic warfare assessment program beginning in 1971.  The Army principally funded BCPO in its early years.  In the late 1990s, however, the Army's funding for and need of BCPO started to dwindle.  BCPO's ever-diminishing assets, money, and utility eventually led it to shut down for good in 2009.

In order to obtain additional funding, the government alleges that Boutte contacted Defendant George Lowe, a lobbyist. Lowe testified that he agreed to provide lobbying services for BCPO. The Department of Defense Appropriations Act for fiscal year 2005 included a $7,000,000 plus up—in other words, a legislative earmark above the Executive Branch's budget— for BCPO. Lowe also assisted BCPO in obtaining an additional $1,200,000 plus up from Congressman Knollenberg during the reconciliation process. Lowe testified at trial that Boutte agreed to pay him a flat fee of $15,000 per month for his lobbying services. Lowe also requested ten percent of the appropriations that he obtained—a request he testified to which Boutte agreed.

So Boutte needed to find a way to pay Lowe. According to the government, Boutte realized he could use to his benefit the 1953 Small Business Act—specifically, § 8(a) of that Act, wherein Congress established the Business Development Program. 15 U.S.C. § 637(a). Put briefly, the § 8(a) Business Development Program authorizes the government to assist eligible small businesses to help them get off the ground. One way the government does that is by awarding eligible small businesses "sole-source contracts"—that is, contracts entered into without engaging in open competition or a competitive process. As a practical matter, this means that on any given project the government will select a § 8(a) small business as its contractor without first making that small business compete with other potential contractors for its services.

The government alleges that Boutte realized he could misappropriate funds from § 8(a) sole-source contracts to pay for unauthorized expenses. But to do so, he needed—obviously enough—small businesses. Thus he and Lowe "conspired and schemed" with Defendants Joe Diaz and Arturo Vargas, two small business owners, to "fraudulently obtain and exploit" § 8(a) sole-source contracts for that illegal purpose.

Diaz was the first small business owner to allegedly lend illegal support by misappropriating a § 8(a) sole-source contract.  He owned a controlling interest in a small business known as Miratek Corporation ("Miratek"), and in due time he enrolled Miratek in the § 8(a) Business Development Program.  The United States eventually awarded a sole-source contract under § 8(a) to Miratek in 2004 to provide various "technical services" to BCPO ("Miratek Contract").  Diaz then allegedly conspired with Boutte to fraudulently divert money from the Miratek Contract to pay unauthorized expenses—specifically, paying Lowe for his services.

The Miratek Contract, however, could not indefinitely support the confederates' supposedly fraudulent scheme.  Funding under that contract slowly had been exhausted, and under the terms of § 8(a), Miratek could no longer participate in the Business Development Program after utilizing it for so many years.  Thus, to keep the lobbying and allegedly fraudulent payments moving along, Boutte and Diaz sought another small business that could seamlessly fill Miratek's role in the scheme.

Enter Arturo Vargas.  Vargas, a Certified Public Accountant doing business as Vargas P.C., had served as Diaz's and Miratek's accountant for nearly sixteen years.  Vargas and Diaz eventually asked the Small Business Administration in late 2005 for permission to combine their services under a joint venture called Vartek, LLC ("Vartek") so they could work together to provide "technical and analytical expertise" to BCPO.  Section 8(a) expressly allows such joint ventures in certain circumstances, and Vartek seemingly satisfied the requisite conditions.  The Small Business Administration thus approved the joint venture.  The government eventually awarded two § 8(a) sole-source contracts to Vartek.

Boutte also allegedly directed Electronic Warfare Associates ("EWA"), another BCPO contractor, to channel money to Lowe.  In all, the contractors paid Lowe $1,200,000—ten percent

of the fiscal year 2004 plus up and Knollenberg plus up, in addition to the $15,000 monthly retainer.

The government charged Boutte with conspiring with Lowe and others to defraud the United States with respect to false claims in violation of 18 U.S.C. § 286 and conspiring to commit wire fraud in violation of 18 U.S.C. § 1349. Boutte's indicted co-conspirators pleaded guilty. Boutte proceeded to trial and the jury convicted him on both counts. At the close of the government's case in chief, Boutte moved for a judgment of acquittal, which the Court denied. Boutte now renews his motion. For the reasons set forth below, the Court denies Boutte's motion.

## II.     Applicable Law

Federal Rule of Criminal Procedure 29 allows a Defendant found guilty to bring a motion for judgment of acquittal. A district court may remove from the jury consideration of a charge with respect to which no rational jury could find guilt beyond a reasonable doubt—thus protecting a defendant's due process rights. *Jackson v. Virginia*, 443 U.S. 307, 317–19 (1979). This "highlight[s] the traditional understanding in our system that the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion." *Id*. at 317 n.10.

The Court asks "only whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. McKissick*, 204 F.3d 1282, 1289 (10th Cir. 2000) (quoting *United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir.1999)). The Court still relies on the jury "to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented." *Id.* The Court will not examine "the evidence in bits and pieces." *United States v. Brooks*, 438 F.3d 1231, 1236 (10th

4

Cir. 2006) (quoting *United States v. Wilson*, 107 F.3d 774, 778 (10th Cir.1997) (internal quotations omitted). Rather, the Court considers the collective inferences drawn from the evidence as a whole to evaluate the sufficiency of the evidence. *Id.*

Only if no reasonable juror could have found the defendant guilty should the Court enter a judgment of acquittal. *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997). The Court must determine whether the evidence would establish each element of the crime. *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004) (citing *United States v. Vallo*, 238 F.3d 1242, 1247 (10th Cir. 2001)). The evidence supporting a verdict does not have to exclude conclusively every other reasonable hypothesis and need not negate all possibilities except guilt. *United States v. Wood*, 207 F.3d 1222, 1228 (10th Cir. 2000) (quoting *Wilson*, 182 F.3d at 742). But if the government can obtain a conviction only by piling inference upon inference, the Court should not find the evidence enough to support a conviction. *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998) (citing *United States v. Jones*, 44 F.3d 860, 865 (10th Cir.1995). Only if a conclusion flows from logical and probabilistic reasoning is an inference reasonable. *Id.* (citing *United States v. Taylor*, 113 F.3d 1136, 1144 (10th Cir.1997).

III.   Analysis

In his motion, Boutte asserts that the government presented "a complete lack of competent evidence that Mr. Lowe performed work in the summer of 2004 or that Mr. Boutte even knew about his involvement or work prior to December 21, 2004." Despite Defendant Lowe's testimony to the contrary, Boutte contends that the government has failed to corroborate it. Boutte thus argues that the government presented no evidence at trial showing a violation of 18 U.S.C § 286 or 18 U.S.C. § 1349. But as a threshold matter, Boutte contends that the charged statutes do not

cover the conduct alleged in the Superseding Indictment.  He also contends that no reasonable jury could have found him guilty.

## A.    Due Process

To satisfy due process, "a law must 'give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.'"  *United States v. Richter*, 796 F.3d 1173, 1188 (10th Cir. 2015) (quoting *United States v. Lovern*, 590 F.3d 1095, 1103 (10th Cir. 2009)). The law also must give the notice "in a manner that does not encourage arbitrary and discriminatory enforcement." *Id.* (quoting *Skilling v. United States*, 561 U.S. 358, 402–03 (2010)). Boutte first argues that the charged statutes "are not designed to cover the conduct alleged in the Superseding Indictment in the context of the [BCPO's] course of business."  Thus, says Boutte, holding him criminally responsible for conduct under a penal statute when that statute does not cover the actions alleged violates due process.[1]

Boutte first argues that in the context of a fee-for-service organization, the government cannot prove that he knowingly helped cause the United States government to pay claims grounded in fraud.  Boutte contends that his awareness that another has made a fraudulent claim is not enough.  He accuses the Court of entertaining a false dichotomy: that no other option to pay Lowe existed other than Boutte's participation in the conspiracy using time and materials contracts.

---

[1] In the context of his due process argument, almost every sentence included in Boutte's motion could be construed as an argument for why the manner in which the Court conducted the trial violated his due process rights.  Obviously, such scattershot arguments are insufficient for a movant to sustain its burden of obtaining a new trial.  *See Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1175 (10th Cir. 2002), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003) (citing *Phillips v. Calhoun*, 956 F.2d 949, 954 (10th Cir. 1992) ("[I]ssues will be deemed waived if they are not adequately briefed.  We do not consider merely including an issue within a list to be adequate briefing.")).  That said, the Court has attempted to group and address Boutte's arguments to the maximum extent possible.

Boutte believes that the government needed to present evidence to the jury of the type of money used. And, according to Boutte, the government did not rebut the testimony from Rego and Magnuson that BCPO was fee-for-service. Thus, Boutte argues he did not know of the scheme and the government produced no evidence that he did; specifically mentioning that no testimony came in that Diaz spoke with Boutte about the scheme.

The Court disagrees with Boutte's assertion that he could not understand what conduct is prohibited under the statute. The elements of 18 U.S.C. § 286 and 18 U.S.C. § 1349 are clear. Those sections prohibit a person from agreeing with at least another person to try to defraud the United States by obtaining the payment of one or more claims based on a false or fraudulent representation of a material fact. That person must know the essential objective of the conspiracy and knowingly and voluntarily involve himself in it. Finally, the members must intend to act together for their shared mutual benefit within the scope of the charged conspiracy. Section 1349 adds the requirement that it was reasonably foreseeable that the scheme to defraud would involve or cause the use of interstate or foreign wire communications facilities for the purpose of carrying out the scheme. And the Court correctly instructed the jury on this law. The applicable statutes do not require the government to identify the source of the government funds, or as Boutte puts it, the type or color of money. Boutte's conduct falls squarely within the "hard core" of the statute's proscriptions. *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973). As the Court will analyze below, the government presented evidence and testimony showing that Boutte entered into an oral agreement with a lobbyist and that BCPO would pay that lobbyist a percentage of the appropriations that the lobbyist helped direct to BCPO. And the government also presented testimony explaining how these payments occurred—through Boutte and Diaz conspiring to use a government contract as a vehicle to pay Lowe. The evidence presented at trial showed that the

claims were made against the United States Department of Interior and against the United States Army under § 8(a) contracts the government awarded to Miratek and Vartek. The evidence also shows that Boutte directed Diaz to pay Lowe under the contracts and that Boutte knew of the funding from the Knollenberg mark.

Boutte next contends that the Court allowed only the government to present its theory to the jury. The Court, according to Boutte, did this by not allowing Magnuson to testify. And without this testimony, Boutte contends the Court precluded the defenses of public authority and entrapment by estoppel. Because of that exclusion, he argues that the jury could not understand the full context of his situation.

But Boutte is incorrect on this point too. As the Court stated at trial, the portion of Magnuson's testimony that the Court excluded was inherently legal. An expert opining about law and regulations to a jury does not assist the trier of fact. Indeed, testimony on legal standards will not assist the Court. *See Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) (stating that a "courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards."). The Court limited Magnuson's testimony so that he would not give his opinion on what the law requires. And in his proffer outside the jury, Magnuson testified about how the law should be interpreted—an aspect of trial designated to the Court, not to the jury. To be sure, in his proffer, Magnuson made evident his intent to testify about inherently legal matters and to essentially testify Boutte committed no regulatory or statutory violations. Magnuson's testimony was, therefore, inherently legal and improper on multiple levels. The jury instructions properly and sufficiently set forth the law necessary for the jury to reach its decision. To the extent Boutte believes the partial exclusion of Magnuson's testimony interfered with his trial strategy, the Court notes that it warned counsel for

8

Boutte repeatedly over the course of this case (some warnings extended back two or more years before trial) that it would not allow expert testimony as to whether conduct was legal. Accordingly, Boutte had ample opportunity to contingency plan in the event Magnuson's testimony (to which the government strenuously and often objected) was excluded in part. Boutte's argument on this point fails.

Third, Boutte again reargues his contention from trial that he should have been able to admit Government Exhibit 175 for completeness because the government used it as both a sword and a shield. The defense cannot later admit the document under the guise of completeness to introduce self-serving hearsay. *United States v. Williston*, 862 F.3d 1023, 1039 (10th Cir. 2017). But again, as the Court stated at trial, the government's usage of the document and the Court's decision not to admit the document reflect applicable Tenth Circuit precedent. Government Exhibit 175 contained hearsay. The government asked specific questions about portions of the document. The Court allowed Boutte to use the document during re-direct examination in the places he believed the government took the document out of context. In fact, a fair reading of the trial transcript demonstrates that the Court allowed Boutte great latitude in this regard—often allowing Boutte to exceed the scope necessary to ensure proper context for the questions posed by the Government from Exhibit 175. In the end, Boutte made no justification permitted by the Federal Rules of Evidence that would allow wholesale admission of Exhibit 175.[2]

Boutte next contends that an allegation the government made in the Superseding Indictment was not legally correct. The Superseding Indictment read that "appropriated funds

---

[2] Indeed, Boutte relied solely on the doctrine of completeness for introduction of the document and posed no other evidentiary basis for full admission of the document. Because his proffered basis for admission lacked merit and the Court heard no other evidentiary basis from Boutte for fully admitting the document, Boutte's argument fails.

generally may not be used to pay for lobbying activities." Boutte asserts that this language assumes the only money BCPO had was appropriated funds limited as to purpose. Boutte thus believes that the laws and regulations, when interpreted in totality, fail to cover the conduct the government alleged to be criminal. Boutte believes the government failed to meet its burden of production to prove that Boutte committed criminal conduct or knew about the conspiracy.

To prove his point, Boutte goes through the Edgewater Contract, the Department of Interior Contract, the 0514 Contract and the 0563 Contract. As to the Edgewater Contract, Boutte contends that the government did not introduce exhibits or testimony to trace the amount of money BCPO paid Lowe through the contract and whether that money was the same money as the appropriated funds that the government alleged that it was. As to the Department of Interior Contract, Boutte argues that because BCPO could use the money for sustainment, BCPO could use that money for the purpose of anything that could sustain the program and the government did not prove that a limitation on the funds existed. As for the 0514 Contract and the 0563 Contract, Boutte says that BCPO received Canadian money and the government did not prove that the money was not comingled or that it was using United States appropriated money. Alternatively, Boutte argues the 0514 Contract had an allowable cost and payment clause in it.

As mentioned above, the statute did not require that the government prove the color of money (as that term is used by Boutte). And more to the point, the government did not charge Boutte with a lobbying restrictions violation. Rather, the government charged Boutte with conspiring to defraud the United States. The issue has never been that lobbying is illegal or that a program such as BCPO can never hire a lobbyist.[3] What mattered here was the diversion of money

---

[3] Although that conclusion could be drawn from the testimony of Boutte's witness, John Guerin, who seemed to testify on several occasions that the use of federal funds to lobby for more federal funds was at least improper and at most illegal.

from government contracts to pay a lobbyist for lobbying services that those contracts did not authorize.[4]  As explained below, the testimony and documentary evidence from trial sustain the jury's verdict.

Lastly in his due process section, Boutte argues that the trial record contains insufficient evidence about his involvement with George Lowe.  He believes that the bulk of the evidence from trial does not support an oral agreement between Lowe and Boutte for ten percent of what Lowe brought in to BCPO.  Boutte argues that if this agreement existed, more evidence would back it up.  He also asserts that John Geurin's testimony undercuts Lowe's testimony.  But Boutte's argument fails to recognize his burden and the manner in which the Court must examine evidence in the context of a motion for judgment of acquittal.  In a criminal trial, "it is the province and function of the jury to observe the witnesses, to appraise their credibility, to weigh their testimony, to draw reasonable inferences from established facts, to resolve conflicts, and to determine the ultimate question whether the guilt of the accused has been established beyond a reasonable doubt."  *Wilcoxon v. United States*, 231 F.2d 384, 385 (10th Cir. 1956).  For purposes of this argument, the Court assumes Boutte is correct that evidence existed that could have allowed a jury to rule in his favor.  But just because he presented competing evidence, perhaps even compelling evidence, that contradicted the government's evidence does not mean that there is no evidence to

---

[4] In his reply brief, Boutte reveals his confusion on this issue.  He argues that if lobbying is irrelevant, then all arguments involving lobbying ought to be removed from the government's case and argument.  That would leave only BCPO paying a subcontractor.  This oversimplification ignores that paying an *unauthorized* contractor under a government contract with fake and fraudulent invoices would be illegal regardless of the title "lobbyist."  The government's case did not hinge on whether an agency like BCPO can never pay a lobbyist.  Put simply, the contract vehicle BCPO used to pay Lowe did not authorize that work—regardless of Lowe's job title.

sustain the verdict.  Here, the jury chose to credit Lowe's testimony.  Sufficient evidence from trial

supports the jury's verdict.

B.  <u>Sufficiency of the Evidence</u>

Boutte asserts that the government failed to present sufficient evidence for the jury to

convict on both Count 1 and Count 2.  As to Count 1, the Court instructed the jury:

> The defendant is charged in count 1 with conspiring to make a false
> or fraudulent claim against any department or agency of the United
> States.   Under the law, it is a crime to make or present to a
> department or agency of the United States a false or fraudulent claim
> against the United States knowing that the claim was false or
> fraudulent.   It is also a crime to conspire with someone else to
> defraud the United States, or any department or agency of the United
> States, by obtaining or trying to obtain payment of any false,
> fictitious, or fraudulent claim.   In this case, the indictment alleges
> that the defendant conspired with others to present false or
> fraudulent claims to the U.S. Department of the Interior and the U.S.
> Army Contracting Agency, which are each a department or agency
> of the United States.
>
> A "conspiracy" is, again, an agreement by two or more persons to
> commit an unlawful act.  In other words, it is a kind of partnership
> for criminal purposes.  Every member of the conspiracy becomes
> the agent or partner of every other member.
>
> The government does not have to prove that all the people named in
> the indictment were members of the plan, or that those who were
> members made any kind of formal agreement.  The heart of a
> conspiracy is the making of the unlawful plan itself, so the
> government does not have to prove that the conspirators succeeded
> in carrying out the plan.
>
> To find the defendant guilty of this crime you must be convinced
> that the government has proved each of the following beyond a
> reasonable doubt:
>
> First:  the defendant agreed with at least one other person to try to
> defraud the United States by obtaining the payment of one or more
> claims based on a false or fraudulent representation of a material
> fact;

12

Second:   the defendant knew the essential objective of the conspiracy;

Third:  the defendant knowingly and voluntarily involved himself in the conspiracy; and

Fourth: there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

A "material fact" is an important fact—not some unimportant or trivial detail—that has a natural tendency to influence or is capable of influencing a decision of a department or agency in reaching a required decision.

A person may be a conspirator even without knowing all the details of the unlawful plan or the names and identities of all the other alleged conspirators.  If the defendant played only a minor part in the plan but had a general understanding of the unlawful purpose of the plan—and willfully joined in the plan on at least one occasion— that's sufficient for you to find the defendant guilty.  But simply being present at the scene of an event or merely associating with certain people and discussing common goals and interests doesn't establish proof of a conspiracy.  Also, a person who doesn't know about a conspiracy but happens to act in a way that advances some purpose of one doesn't automatically become a conspirator.

At trial, the government presented an April 21, 2004 email from Boutte to Lowe in which Boutte said that he hoped to obtain a plus up in fiscal year 2005 because otherwise, BCPO would have to start closing its doors. Gov't ex. 1. Lowe testified that he and Boutte had an oral agreement in which he would lobby on behalf of BCPO.[5]  Trial Tr. 345–46.  For services rendered, BCPO

---

[5] Boutte argues that "there was a complete lack of competent evidence that Mr. Lowe performed work in the summer of 2004 or that Mr. Boutte even knew about his involvement or work prior to December 21, 2004."  The trial transcript contradicts this assertion.  Lowe testified about his lobbying in the summer of 2004 and his conversations with Boutte before December 21, 2004.  Although Boutte introduced what he believes was contrary evidence, Lowe's testimony is competent evidence of these facts for the jury to rely on in making its determination.  The Court and Boutte's counsel had an exchange about this during a bench conference at the end of trial:

MR. BANES: And what evidence do we have, other than Mr. Lowe saying it, that he did anything that summer?

would pay Lowe $15,000 per month.  *Id.*  In October 2004, Lowe traveled to San Diego and met

with Boutte, Ron Unruh, and Nick Toomer.  *Id.* at 362–63.  Lowe and Boutte had breakfast

together.  *Id.* at 364.  At that breakfast, Lowe informed Boutte that he could possibly obtain an

additional $1.2 million and asked Boutte whether that money would be something BCPO was

interested in.  *Id.*  This money came from Lowe lobbying Congressman Knollenberg's office.

Lowe said Boutte was pleased and said yes.  *Id.* at 365.  Also while in San Diego, Lowe said that

on top of the $15,000 per month, he requested a ten percent bonus on the $8.2 million in

appropriations Lowe said he helped direct to BCPO—both the $7 million and separate $1.2 million

plus ups.  *Id.*  Boutte agreed.  *Id.*

Joe Diaz testified to the jury how these payments occurred.  The Department of Interior

awarded Miratek an Indefinite Delivery / Indefinite Quantity (IDIQ) contract in the spring of 2004.

Gov't ex. 7.  This contract provided program management support to unspecified government

agencies on a Time and Materials basis.  *Id.*  Boutte and Diaz then conspired to use that contract

as a vehicle to pay Lowe.  Trial Tr. 1096 ("Q: So Milton Boutte was among the people who

---

THE COURT: That's evidence.  I mean, they can beat you with that.
If the Jury comes back for them and that's all they got you lose.
MR. BANES: Well, but there's certainly evidence to the contrary of
that.
Trial Tr. 3058.  And again during closing arguments, Boutte's counsel acknowledged Lowe's
testimony: "That guy [Lowe] that got up here?  I didn't like him.  I don't think anybody did. . . .
Ultimately, I didn't have to impeach Mr. Lowe."  Trial Tr. 3289.  Regardless of Lowe's likeability,
whose testimony to believe is a question left to the jury.
Boutte also argues that no one corroborated Lowe's testimony.  But Lowe testified about
conversations and agreements he claims to have had with Boutte.  Again, the reason we have jury
trials is for the jury to determine the facts of the case.  And a reasonable jury could credit Lowe's
testimony as true.
Ultimately, in ruling on this motion, the Court must view this evidence a light most
favorable to the Government.  Throughout the proceeding, Boutte's arguments have ignored this
standard—instead suggesting that he should prevail because the Government's witnesses lacked
credibility or that their testimony was unreliable.  Such an argument reflects a misunderstanding
of the standard or a conscious decision to ignore it.

approached you?  A: Yes, sir.  They needed a contract vehicle for sustainability to the program.");
Trial Tr. 746 ("Q: Whose decision was it that you pay George Lowe? A: Again, it came from the
Program Office, Milton Boutte."); Trial Tr. 762 ("Milton Boutte told us to keep paying.").  In
September 2004, Diaz issued a Task Order authorizing Miratek to provide specified technical and
analytical services to BCPO under the IDIQ contract.  *Id.* at 750.

Lowe then faxed four invoices to Miratek for the months of July, August, September, and
October 2004.  *Id.* at 742–43.  Lowe's invoices showed a flat rate and did not fit within the labor
categories specified in the IDIQ contract.  *Id.* at 746 ("we have concerns with these invoices that
are being submitted before we even have a contract in place.  The exorbitant amount of 15K a
month with no—we don't have an idea of the real technical deliverables, so we have concern
moving forward with them.").  This confused both Diaz and Unruh.  *Id.*  Unruh, however, emailed
Diaz that he had discussed the situation with Boutte and that Miratek needed to have funding in
place to cover Lowe.  *Id.* at 749; Gov't ex. 14 ("I discussed the situation with Milt.  Evidently
George has sold himself that he can bring numerous large programs and funding to Big Crow,
therefore you and I will need to work diligently to ensure that we have funding in place to cover
George.").  Diaz testified that Boutte instructed him to pay Lowe the sums of money that Lowe
demanded.  Trial Tr. 1099 ("Q: Can you confirm for the jury whether Mr. Boutte directed Miratek
to pay George Lowe?  A: Yes, I can confirm that.").

Once Miratek ran out of funds, Boutte directed EWA to pay $300,000 to Lowe through
Edgewater Technologies—money that Lowe received in October 2005.  *Id.* at 463–66.  But when
Miratek once again had the funds, it and Vartek continued to make payments to Lowe at Boutte's
request.  *Id.* at 762.  Miratek submitted its last payment to Lowe in September 2006.  *Id.* at 507.
In all, Miratek and EWA paid $1,210,000 to Lowe—an amount equal to ten percent of the fiscal

year 2004 plus up and Knollenberg mark plus a monthly retainer of $15,000 that Boutte agreed to pay Lowe for lobbying services between May and July 2004. *Id.* at 507–08.

Boutte complains that no reasonable jury could have concluded that he knew about the conspiracy and knowingly joined it. He claims that the government characterized him as automatically becoming a conspirator because he was head of the BCPO. The Tenth Circuit has long held that a conspiracy defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role in the conspiracy. *United States v. Mendoza-Salgado*, 964 F.2d 993, 1005 (10th Cir. 1992) (citing *United States v. Savaiano*, 843 F.2d 1280, 1294 (10th Cir.1988)). The government instead need only prove "that the defendant knew at least the essential objectives of the conspiracy, and the defendant knowingly and voluntarily became part of it." *Id.* Here, the government elicited testimony from George Lowe that he had an oral agreement with Boutte for $15,000 per month plus a ten percent bonus on the total of $8.2 million. Trial Tr. 346, 365. If Lowe was not receiving payment, he would call Boutte on his cell phone, articulate that he was not getting paid, and then he would soon after receive some payment. *Id.* at 417. Diaz testified that Boutte approached him about a contract vehicle for sustainability to the program. *Id.* at 1096. Diaz also testified that he had personal conversations with Boutte about the contracts and that Boutte was aware of the invoices that Miratek sent to the government.[6] *Id.* at 1099. Diaz also testified about Boutte's reaction to Lowe's calls. *Id.* at 794. Boutte told Diaz, "You guys need to take care of business," and slammed his fist on a desk. *Id.* Boutte also told

---

[6] Boutte claims that testimony confirms that he had no input into what contract vehicles BCPO used to pay Lowe. Although Diaz testified that he could not verify every conversation that Ron Unruh had with Boutte or whether Boutte was aware of the invoices Miratek submitted to the government, Diaz could confirm that Boutte had conversations with him about the contracts and that Boutte directed Miratek to pay Lowe. Trial Tr. 1099.

Diaz to "take care of business or clear your desk and get the hell out of here." *Id.* Here, the jury could believe Lowe's testimony that Boutte agreed to give him a percentage of appropriated money that Lowe obtained for BCPO.[7] And Boutte's knowledge of the "color" of money has no bearing on his innocence in the conspiracy, so no evidence was necessary on that point. Boutte claims that he did not have any say in how BCPO would pay Lowe and that no evidence ties him directing Diaz to use the § 8(a) contracts to satisfy BCPO's commitment to Lowe. But the jury had evidence of Boutte agreeing to pay a lobbyist a percentage of what that lobbyist pulled in via government appropriations and evidence of Boutte pressuring a contractor to find a contract vehicle to pay the lobbyist. And anytime that the contractors did not pay, he repeatedly kept the conspiracy in motion by insisting that they pay Lowe.

Boutte also claims no interdependence exists and that he was a victim of the conspiracy. But based on testimony presented at trial, the jury could infer that Boutte would benefit from the BCPO remaining open rather than closing its doors. Gov't ex. 1 ("I hope [congressional support] will continue so that we can get a plus up in FY 05 otherwise we have to start closing our doors."); Trial Tr. 1827 ("Q: Can you tell us, what did Mr. Boutte focus on? And just focus on professionally, what his main focus was in the office. A: Sustaining the office, getting funding.").

As to Count 2, the Court instructed the jury:

> The defendant is charged in count 2 with conspiring to commit wire fraud. The crime of wire fraud concerns the use of interstate wire-communication facilities in carrying out a scheme to intentionally defraud others or to obtain money by means of false or fraudulent pretenses, representations, or promises. The crime of wire fraud is committed when someone uses or causes someone else to use interstate wire-communication facilities for the purpose of carrying out such a scheme. It is also a crime when someone conspires with one or more other persons to commit wire fraud.

---

[7] Indeed, Kurt Lohmann testified that he was walking past Boutte's office and overheard Boutte say, "George Lowe is blackmailing me." Trial Tr. 290.

17

To find the defendant guilty of the offense of conspiracy to commit wire fraud, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First, the defendant agreed with at least one other person to carry out a scheme to defraud as alleged in the indictment; that is, a scheme to obtain money or property by materially false or fraudulent pretenses, representations, promises, concealments, or omissions;

Second: the defendant knew the essential objective of the conspiracy;

Third: the defendant knowingly and voluntarily involved himself in the conspiracy;

Fourth: it was reasonably foreseeable that the scheme to defraud would involve or cause the use of interstate or foreign wire-communications facilities for the purpose of carrying out the scheme; and

Fifth: there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

A "scheme to defraud" is conduct intended to or reasonably calculated to deceive persons of ordinary prudence or comprehension. A "scheme to defraud" includes a scheme to deprive another of money, property, or the intangible right of honest services.

"Intent to defraud or to obtain money or property by means of false or fraudulent pretenses, representations or promises" means an intent to deceive or cheat someone.

A representation is "false" if it is known to be untrue or is made with reckless indifference as to its truth or falsity. A representation would also be "false" when it constitutes a half truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud.

A false statement is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed.

18

To "cause" interstate wire-communications facilities to be used is to do an act with knowledge that the use of the wire facilities will follow in the ordinary course of business or where such use can reasonably be foreseen.

Count 2's elements are identical to Count 1 but include an element that it was reasonably foreseeable that the scheme to defraud would involve or cause the use of interstate or foreign wire-communications facilities for the purpose of carrying out the scheme. And the government proved that element by producing evidence of wire communications—specifically, emails in furtherance of the conspiracy and payments made to Lowe by wire transfer.[8]

IV.    Conclusion

For these reasons, the Court DENIES Boutte's Renewed Motion for a Judgment of Acquittal and Motion for Judgment Notwithstanding the Verdict (Doc. 346).

IT IS SO ORDERED.

Entered for the Court
this the 2nd day of March, 2023

/s/ Joel M. Carson III_____
Joel M. Carson III
United States Circuit Judge
Sitting by Designation

---

[8] For the first time in his reply brief, Boutte argues that the government produced no evidence at trial to support action on the forfeiture allegation from the Superseding Indictment and that the Court should dismiss it. Given that the government had no opportunity to respond to this late argument, the Court will not address it now. Boutte may make this argument before sentencing.