IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                            1:17-cr-3338-JMC

MILTON BOUTTE,
JOE DIAZ,
ARTURO VARGAS,
and GEORGE LOWE,

    Defendants.

## ORDER DENYING DEFENDANT MILTON BOUTTE'S MOTION FOR RELEASE PENDING APPEAL

On June 26, 2023, Defendant Milton Boutte ("Boutte") filed a Motion for Release Pending Appeal (Doc. 424). In the motion, Boutte requests release pending his appeal pursuant to 18 U.S.C. § 3143(b). For the reasons below, the Court denies Boutte's Motion for Release Pending Appeal.

                                                     I.        <u>Background</u>

Boutte headed the Big Crow Program Office ("BCPO") at Kirtland Air Force Base in Albuquerque, New Mexico. In order to obtain additional funding, the government alleges that Boutte contacted Defendant George Lowe, a lobbyist. Lowe testified that he agreed to provide lobbying services for BCPO. The Department of Defense Appropriations Act for fiscal year 2005 included a $7,000,000 plus up—in other words, a legislative earmark above the Executive Branch's budget— for BCPO. Lowe also helped BCPO obtain an additional $1,200,000 plus up from Congressman Knollenberg during the reconciliation process. Lowe testified at trial that Boutte agreed to pay him a flat fee of $15,000 per month for his lobbying services. Lowe also requested ten percent of the appropriations that he obtained—a request, at least according to him, to which Boutte agreed.

The government charged Boutte with conspiring with Lowe and others to defraud the United States in violation of 18 U.S.C. § 286 and conspiring to commit wire fraud in violation of 18 U.S.C. § 1349. Boutte's indicted co-conspirators pleaded guilty. Boutte proceeded to trial and the jury convicted him on both counts. Boutte's United States Sentencing Guideline imprisonment range was 70–87 months. The Court, exercising its discretion pursuant to 18 U.S.C. § 3553(a), varied downward and sentenced Boutte to 24 months' imprisonment.

## II.     Applicable Law

Title 18 U.S.C. § 3143(b) provides that "a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal . . . be detained, unless the judicial officer" concludes "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released" and "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in" reversal, an order for a new trial, a sentence that does not include a term of imprisonment, or a reduced sentenced to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process. "[A] 'substantial question' is one of more substance than would be necessary to a finding that it was not frivolous. It is a 'close' question or one that very well could be decided the other way." *United States v. Affleck*, 765 F.2d 944, 952 (10th Cir. 1985).

## III.     Analysis

In his motion, Defendant Boutte raises five issues that he believes raise substantial questions that warrant a reversal or a new trial: (1) the denial of his motion for new trial dated June 13, 2023; (2) the decision to allow some testimony while excluding other testimony; (3) the exclusion of an exhibit; (4) consideration of the § 3553(a) sentencing factors; and (5) the denial of due process at his sentencing hearing. We address each in turn.

A.      Motion for New Trial Dated June 13, 2023

Boutte first contends that the Court erred in denying his motion for new trial based on "newly discovered evidence." Boutte's new evidence was a sworn declaration dated June 12, 2023 from Rod Tinney attempting to impeach co-Defendant George Lowe's trial testimony. In the order denying the motion for new trial, the Court concluded that Boutte's motion failed on three grounds. It first failed because Boutte's own lack of diligence caused the failure to learn of the evidence, second because the new evidence was merely impeaching, and third because the new evidence was not material to the principal issues involved.

In this motion, Boutte simply restates his previous arguments. But the government disclosed evidence to Boutte before trial that could have prompted Boutte to contact Tinney before trial. The "evidence" Boutte "newly discovered" was discoverable at the time of trial. Boutte continues to attack Lowe's credibility. This "new" evidence presents competing stories and is impeaching. As to materiality, a jury could resolve any difference in recollection between Lowe and Tinney with the acknowledgment that two meetings occurred and Tinney was not at one of them. In addition, the jury heard about other meetings between Lowe and Boutte, such as one in-person meeting in October 2004 in San Diego where Boutte and Lowe agreed that Lowe would receive ten percent of any funds that he successfully directed toward BCPO. The government did not present the contents of the September 20, 2004 meeting at trial and they were not material.

The Court's denial of Boutte's motion for a new trial June 13, 2023 does not raise substantial questions that warrant a reversal or new trial.

B. <u>Trial Testimony</u>

Boutte next contends that the Court erred in allowing Keith Larson to testify without limiting the government's line of questioning while limiting Allen Magnuson's testimony, who purportedly would have testified about similar subjects as Larson.

Larson first testified in the government's case-in-chief. In his motion, Boutte says his counsel "objected repeatedly to the Government's direct examination of Mr. Larson." Not so— Boutte objected five times during the Government's direct examination of Larson, three of which were objections based on leading questions. Boutte's first objection came at the very beginning of Larson's testimony before he said anything of substance:

> THE COURT: What is your objection?
> MR. BANES: It sounds to me like they are laying a foundation for expert testimony on this and I am just wondering if they are trying to get into the interpretation of the contract. Mr. Larson's statement already says that he didn't review the task order under which all of this was billed.
> THE COURT: I don't know. Well, there is no evidence from him on the record.
> MR. BANES: Well, I have his statement and he testified that he reviewed the original contract but he didn't see anything that happened after it, so now they are --
> THE COURT: We don't even know what the testimony is going to be. Would you like to -- why don't we just proceed and if they say something objectionable, you can object and we will come back up.
> MR. BANES: Okay, your Honor.

Tr. Vol. 5 p. 1137. When the government asked Larson "[s]o when you are reviewing for compliance and making a determination of legal sufficiency, what is the universe of applicable laws and regulations that you are comparing it against," the Court sua sponte asked counsel to approach without objection from Boutte:

> THE COURT: Let's hold on for a minute. Could counsel approach? I am just making sure you want to go here. You let him start talking about statutes and regulations, specifically you are changing the entire course of this trial based upon what has been talked about

4

> before.  Mr. Banes has an expert who is dying to get up there and talk about the same stuff.  You said he can't, so let me know where you are headed.
> MR. PENA: I am going to focus on legal sufficiency.  He actually reviewed the contract for legal sufficiency, and I am going to ensure that he found it legally sufficient.  There is no other way to do it.
> THE COURT: You need to have him identify all of the applicable suits [sic] and regulations and his analysis of them for him to be able to testify they were legally sufficient.
> MR. PENA: It was a general question.
> THE COURT: I think you might rephrase it because, as I read it or I heard it, at least -- let's hold on.  Okay.  So when you are reviewing compliance and making a determination of legal sufficiency, what is the universe of applicable laws and regulations that you are comparing it against.  And he says that is a really broad question because I think he took it as meaning tell me all the laws and regulations you have got to comply with.
> MR. PENA: Okay.  I will ask a more focused question.
> THE COURT: I want you to be warned ahead of time that if we get down a path where he is talking law, then you have given Mr. Banes a path for Mr. Magnuson to come talk law.  And we have been strong on the idea that that wasn't going to happen for the whole case, now, okay.
> MR. PENA: Yes, sir.
> THE COURT: All right.  Thank you.

Tr. Vol. 5 p. 1151–52.  Later in the direct, Boutte's counsel again objected:

> THE COURT: Okay, state your objection.
> MR. BANES: Your Honor, the objection is that he's using him as an expert witness on fiscal law and appropriations law and contract law, and he's either opened the door to everything or, you know, we can't use any of it.
> THE COURT: He hasn't opened the door to everything, but go ahead.  That's as broad as his questions about statues [sic] and regulations.
> MR. BANES: It is -- well, he's going through, I mean, Magnuson is a fiscal law expert, so --
> THE COURT: Right.
> MR. BANES: Are we open now?
> THE COURT: I don't know yet.  I will decide that after he's finished his testimony.
> MR. BANES: I mean, I think we've already gotten there.
> THE COURT: Let me tell you what I think.  This is just for your -- there's really -- I guess there's no objection.  You just want to be

5

>sure that if he ventures too far across the line that your guy is not going to be limited to less than his guy.
>MR. BANES: It is not just that, I mean, you know, Your Honor, we don't want this case to go any longer than it has to.
>THE COURT: I agree.
>MR. BANES: And, you know, if he's going to get up there and tell the jury what the law is so, they can just preserve it, you know, that kind of thing. Then I'm kind of concerned about that because my client – my expert doesn't go until the end of next week.
>THE COURT: Right.
>MR. BANES: So they are sitting there talking; I know what the next questions are: "Well, if he's using this kind of money for this contract isn't that illegal"?
>MR. PENA: To clarify, I'm not going to ask a question about that. I'm not going to ask him hypotheticals; I'm going to ask him about legal sufficiency.
>MR. BANES: You're going to stop asking him hypotheticals, you mean?
>THE COURT: He's not. So the way I do this, and as I have been sitting here thinking of it, I'm going to have to give you some latitude with Magnuson so you get some background. This is this guy. I mean, I don't know that he needs to be. I'm not exactly sure where all this is headed, but we'll -- this guy explaining how he does his job and what he does on a day-to-day basis, I would just admonish him to stay in fact. I may admonish him to stay within his own experience and talk about what he was doing in relation to this. And then, you know, we'll deal with Magnuson when he comes up, and we can talk about it beforehand next week after this witness has been put on and everybody has had a chance to digest what he says. I will say I wasn't expecting someone who was going to get up and talk about appropriations law to us; mentioning status [sic] and regulation and various other things. That's been a surprise to me based on all our conversations all along. But, you know, I do see the need for him to give some explanation of how he does what he does. . . .

Tr. Vol. 5 p. 1163–66. The Court right then admonished the jury that the government did not designate Larson as an expert. The trial transcript shows that Larson did not testify to how all the applicable statutes and regulations work. He testified about how he performed his job in relation to the contract at issue in the case.

6

The government also called Larson as a rebuttal witness. But Boutte's motion fails to convey the full story of why the government called Larson as a rebuttal witness and why the Court excluded Allen Magnuson's testimony. The Court excluded Magnuson's testimony because it was inherently legal. The Court ruled that Magnuson could not testify about laws and regulations and how it is possible to lobby legally. But the Court did allow Magnuson to make a proffer on the record outside the presence of the jury. Magnuson's proffered testimony essentially instructed the Court on how the law was to be interpreted. His testimony would not have helped the jury and the Court excluded it as improper expert testimony. Boutte was no notice that Magnuson would not be allowed to opine on the law and regulations. The Court repeatedly admonished Boutte throughout the trial and in pretrial proceedings that testimony on legal issues would not be allowed.

The government presented Keith Larson as its sole rebuttal witness at trial in response to error that Boutte invited. Earlier in the trial, Boutte's counsel elicited testimony from General Robert Rego that Federal Acquisition Regulation 31.205-22 was not applicable to time and materials contracts. When Magnuson gave his proffer, he disagreed with this statement. And when questioned by the Court, Boutte's attorney conceded Rego made a misstatement on the stand:

> THE COURT: And as I understand it, Mr. Banes even thinks his own witness made a misstatement on the stand.
> MR. BANES: About time and materials contract?
> THE COURT: Yes.
> MR. BANES: Yes.
> …
> THE COURT: This is our opportunity to clean it up in a manner that doesn't take a lot of resources to do. And, I mean, it seems to me it could be resolved with a stipulation as to General Rego said X. The parties agree that that was a misstatement on his part, period.
> MR. BANES: I don't know if I want to do that your honor.

Tr. Vol. 9 p. 3168–670.

The next trial day, the Court proposed an instruction to the parties regarding Rego's misstatement. The government said it had no need to call Larson as a rebuttal witness if the Court gave the instruction. The Court then said that it would not allow Larson to testify. But then Boutte's attorney backtracked:

> MR. BANES: I was asking him about time and materials contracts, and he's not wrong. As a --
> THE COURT: Well, your expert, at least on a hypothetical basis, testified to the contrary.
> MR. BANES: Not before the Jury, Your Honor. And now we're having somebody testify before the Jury to rebut something that Mr. – General Rego didn't even say.
> THE COURT: He did say it.
> MR. BANES: Yes. But it's not wrong as a legal matter. How can you rebut something -- how can we have a witness rebut a legal matter?
> THE COURT: You agreed last week that it was wrong and you sat there and you told me, Your Honor, I'm sorry. I didn't mean for him to say that.

Tr. Vol. 10 p. 3186–87. The Court then said that the instruction assumed that Boutte agreed with it, so the Court allowed the government to call Larson as a rebuttal witness. The Court said that it would not allow the government to qualify him as an expert and that the government would have ten minutes to put him on. Larson then rebutted Rego's testimony. The Court did not allow Larson to testify as an expert under the guise of a lay witness and was very clear to the jury on this point.

The Court's decisions to allow Larson to testify and to exclude portions of Magnuson's testimony do not raise substantial questions that warrant a reversal or new trial.

C. Exclusion of Exhibit

Boutte next asserts that if the Court had allowed him to introduce Defense Exhibit 394, the outcome of the trial might have been different. Defense Exhibit 394 is a Department of the Army memorandum related to an internal review and audit of the BCPO. Boutte argues that the

document showed that unindicted co-conspirator Ron Unruh "was doing the exact thing of which Mr. Boutte was accused and was responsible for the planning and his so-called 'mousetrap' for Mr. Boutte."  He contends that the document "would have shown the jury that there was someone with access to the same information who was actually reprimanded for misappropriating funds and misrepresenting himself as a government employee."

Boutte first attempted to introduce the document during his cross-examination of co-Defendant Joe Diaz.  After the government objected, the Court expressed concern that the document had no temporal limitation so that the jury could tell if the Army was referencing conduct that occurred at or near the time of the events in the indictment given the four-year gap between the date of the memorandum and the events at issue in the case.  The Court told Boutte's counsel that he could ask the witness if he was aware that Unruh was "dinged by the Army for improperly holding himself out as a Government employee."  The Court also said that Boutte's counsel could ask if Unruh was ever investigated for this and if the witness had any knowledge of it.  The Court also commented that it was not an impeaching document because neither side planned to call Unruh as a witness.  The Court said it would study the issue further before making a definitive ruling.

The next day, the Court said it would not allow Boutte to admit the document.  The witness on the stand had no knowledge of the document.  Boutte's attorney wanted to use it to discredit Unruh's statements.  The Court said that evidence that Unruh's statements cannot be believed is proper in the correct evidentiary form.  But this document was not appropriate and Diaz, on the stand, was not the correct witness to talk about the document.  Using Exhibit 394 with Joe Diaz would have been improper impeachment.  But the Court was clear to Boutte that the conduct that Unruh had been alleged to have engaged in was fair game.  The Court also told the parties that the

document troubled it for a couple of reasons. First, although the investigator's language was unqualified, definitive, and conclusive that Unruh did the things he was accused of doing, the document did not explain how the investigator reached the conclusions. Second, the document as framed appeared to show an investigation that was started with the conclusion that Unruh had done something wrong and then they investigated it. Third, the document is on United States Department of Army letterhead, which gives it an air of authority that a regular memorandum does not have.

Boutte later filed a brief in support of Exhibit 394's admissibility. The Court denied the request under Federal Rule of Evidence 403. The document is not a final adjudication although it speaks as though it is. Second, the document appeared commissioned with a result in mind—which is problematic in and of itself—suggesting that the document was not reliable and could lead to confusion. Finally, the Army's official letterhead added to the Court's decision. The document was substantially more prejudicial than probative and was likely to confuse the jury.

Boutte had the opportunity to talk about the contents of the document without its introduction into evidence. The Court's decision to exclude the document under Rule 403 does not raise substantial questions that warrant a reversal or new trial.

## D.   Consideration of the § 3553(a) Factors

Next, Boutte argues that the Court did not properly consider the § 3553(a) factors when imposing his sentence. Boutte first contends that the only evidence put on with respect to his health and family situation was by him and that the Court should not have looked to cases outside the Tenth Circuit. Second, Boutte posits that "Mr. Boutte's conduct itself was not a real issue for either the prosecution or the Court, or whether the BCPO was a critical national asset or not. Finally, Boutte argues that he was not the central planner and leader of the conspiracy.

Before turning to each of these points, the Court notes that Boutte does not argue any of the statutory factors for why the Court should have varied downward from the Guideline imprisonment range of 70–87 months to a probation or home detention sentence.  In imposing Boutte's sentence, the Court imposed a sentence sufficient, but not greater than necessary, to comply with the statutory sentencing purposes.  The Court considered the nature and circumstances of the offense and his history and characteristics, the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, the need to afford adequate deterrence to criminal conduct, the need to protect the public from further criminal conduct by Boutte, and the need to provide restitution.  The Court found Boutte had no prior criminal history, and this offense appeared to be a deviation by Boutte from an otherwise law-abiding life.  The Court noted Boutte is 78 years old and has several medical issues, including severe cardiac trouble, aortic valve stenosis, diabetes, hypothyroidism, intervertebral disc degeneration, hypertension, osteoporosis, and chronic obstructive pulmonary disease (COPD).  The Court considered that Boutte has undergone a quadruple bypass surgery in the past and that Boutte recently was admitted to the emergency room for chest pain and trouble breathing in September 2022, and had a pacemaker implanted in October 2022.  The Court observed that Boutte takes a plethora of medications as well. Additionally, Boutte's wife suffers from significant medical issues including, osteoporosis extensive cardiac issues (pacemaker implanted in April 2020), chronic obstructive pulmonary disorder (COPD), and cancer including leiomyosarcoma and Myelodysplastic syndrome (MDS).  Based on those findings, the Court determined a sentence below the advisory guideline imprisonment range would be reasonable and sufficient, but not greater than necessary, to accomplish the sentencing goals set forth at 18 U.S.C. 3553(a).  A jury found Boutte guilty of the crimes charged and the Court could not ignore that Boutte conspired

11

with others to defraud the United States of over $1.2 million and he abused his position of trust, in that as Director, he had professional and managerial discretion over all aspects of the BCPO. To say that the Court did not consider the § 3553(a) factors in imposing Boutte's sentence ignores the reality of the sentencing hearing.

Defendant's motion—rather than discussing the § 3553(a) factors—focuses on the Court denying Boutte's motions for downward departure. Boutte complained that he was the only party to put on evidence regarding his departure motions regarding health and family situation. The Tenth Circuit imposes no requirement on the government to do so. That's because the "defendant bears the burden of proving he is entitled to a downward departure." *United States v. Archuleta*, 128 F.3d 1446, 1449 (10th Cir. 1997). In ruling on the departure, this Court considered out of circuit cases—an appropriate consideration given that part of the standard the Court looks at in granting a departure is whether a defendant's case falls outside the heartland of cases that this Court and other federal courts see. *See id.* at 1451 (comparing the Tenth Circuit's concept of family circumstances to other circuits in concluding they fell within the Guidelines' heartland). The Court noted that Boutte's case did not fall outside the heartland of cases in denying the departure but said it would consider those factors in its decision to vary downward.

Importantly, the Court should note that Boutte takes issue that the Court cited an Eighth Circuit case, *United States v. Coughlin*, 500 F.3d 813 (8th Cir. 2007), as similar. Coughlin had an unusual heart condition in that he had suffered multiple life-threatening cardiac episodes. A doctor had testified that incarceration would place Coughlin in a position of danger and may well cause his death. Another doctor testified that she could not guarantee that Coughlin would receive his currently prescribed drugs. That doctor also conceded that Coughlin would be reliant on the ability of ordinary prison staff to quickly notice and notify a doctor or emergency response team. Despite

all this evidence, Coughlin's conditions, although bad, were not sufficient to keep him out of jail under a departure theory.  The Court cited *Coughlin* among others to support its denial of a departure.[1]  The Court cited the Seventh Circuit's decision in *United States v. Johnson*, 427 F.3d 423, 426 (7th Cir. 2005) for the proposition that these disfavored departures are obsolete post-Booker when a sentencing court can consider such factors in a variance under 18 U.S.C. § 3553(a).  The Court cited in-circuit authority for the proposition that family ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.  *United States v. Rodriguez-Velarde*, 127 F.3d 966, 968 (10th Cir. 1997).  The Court cited two cases from the Sixth Circuit because it has addressed a very similar situation in *United States v. Christman*, 607 F.3d 1110, 1120 (6th Cir. 2010), where it said that a downward departure for a defendant's role in caretaking for his ill wife was improper.  The Sixth Circuit in *United States v. Bistline*, 665 F.3d 758, 767 (6th Cir. 2010), reversed a district court decision to mitigate a sentence based on the defendant's role as caretaker of an elderly relative because nursing home care was available though costly.

Boutte next argues that his "conduct itself was not a real issue for either the prosecution or the Court, or whether the BCPO was a critical national asset or not."  Boutte further accuses the Court of believing that the BCPO was not a real government agency.  He further asserts that the Court believes Boutte "benefitted himself merely because he received a government salary."  He also says that there was no loss in this case.  None of these arguments is consistent with the

---

[1] Boutte argues that the "Court found that a disagreement between the Circuits was sufficient to determine that Mr. Boutte's medical conditions were not severe enough to warrant a departure from the guidelines."  The Circuits are not in disagreement.  The Court's reference was to the lonely opinion of a single dissenting judge.  This is a disfavored ground for a departure.  The Court considered Boutte's evidence regarding his health and decided to vary downward in part based on his health.

13

testimony presented at trial. The government charged Boutte with conspiring with Lowe and others to defraud the United States with respect to false claims in violation of 18 U.S.C. § 286 and conspiring to commit wire fraud in violation of 18 U.S.C. § 1349. Boutte proceeded to trial and the jury convicted him on both counts. The government presented evidence and testimony showing that Boutte entered into an oral agreement with a lobbyist and that BCPO would pay that lobbyist a percentage of the appropriations that the lobbyist helped direct to BCPO. And the government also presented testimony explaining how these payments occurred—through Boutte and Diaz conspiring to use a government contract as a vehicle to pay Lowe. The evidence presented at trial showed that the claims were made against the United States Department of Interior and against the United States Army under § 8(a) contracts the government awarded to Miratek and Vartek. The evidence also shows that Boutte directed Diaz to pay Lowe under the contracts and that Boutte knew of the funding source. Despite the evidence against him, Boutte has repeatedly failed to accept responsibility for his criminal conduct.

Lastly, Boutte says the Court's finding that he was the leader of the conspiracy "was incredible" and that others "sprung [a] mousetrap" on him. Boutte's argument ignores the trial testimony. Boutte made unauthorized promises to pay Lowe. And when Lowe could not convince anyone to pay him, Lowe's trial testimony was that he called Boutte and he ended up paid. Boutte exercised decision-making authority within the criminal scheme described in the Superseding Indictment and proven at trial. Even though Boutte did not personally fashion the fraudulent invoices, the government proved at trial that he orchestrated the scheme to divert funds from Miratek's, Vartek's, and EWA's contracts to Lowe and other unauthorized subcontractors. As to Boutte's contention that he did not keep large sums for himself, that misses the point that he benefited from making payment to Lowe of unauthorized obligations.

The Court's decision to vary downward and impose a term of imprisonment of 24 months given the Guideline range of 70–87 months' imprisonment does not raise substantial questions that warrant a reversal or new trial.

E.     Due Process

Finally, Boutte argues that the Court denied him due process at his sentencing hearing. His one-paragraph argument has three points, two of which he raised earlier in the motion.[2] First, he contends that the Court used his motion for new trial against him by calling the new evidence "merely impeaching evidence" and says that the Court set up a standard where defense counsel had to interview every single person. In Defendant's mind, this "set the bar higher than it has ever been. Boutte cites no authority for this proposition. As mentioned above, the government disclosed evidence to Boutte before trial that could have prompted Boutte to contact Tinney prior to trial. He decided not to do so. The Court did not deny his due process rights.

Second, Defendant again takes issue with the Court's citation to *United States v. Coughlin*. As to the general proposition that this Court may not look to cases from around the country in deciding whether Boutte's case falls in the heartland of the Guidelines, Boutte presents no authority that is improper. Circuit courts from across the country—including the Tenth Circuit— make clear that a departure based on a physical condition is a discouraged ground on which to depart and should be limited to exceptional circumstances.

Third, Defendant complains that the "prosecution successfully shifted the burden to the defense" on Defendant's age and health. Again, the Court notes that defendant bears the burden

---

[2] Arguably, Boutte's cursory treatment of the due process issue is insufficient to present the issue for decision. Indeed, such abbreviated and scattershot arguments that lack adequate development are disfavored. *See* D.N.M.LR-Civ 7.3(a) ("A motion . . . must cite authority in support of the legal positions advanced.") Out of an abundance of caution, however, the Court will address the issue.

of proving he is entitled to a downward departure." *United States v. Archuleta*, 128 F.3d 1446, 1449 (10th Cir. 1997).  Relatedly, Defendant argues that the fact that probation reached out to the Bureau of Prisons at the Court's request to ask if it could handle Boutte's situation was improper.  Again, Defendant provides no support for his contention.  In contrast, United States Probation and Pretrial Services reaches out to Bureau of Prisons medical centers to see if a defendant can have his needs met.  *See United States v. Jauregui-Perez*, 376 F. Supp. 2d 1060, 1061 (D.N.M. 2004) (noting that probation contacted the Bureau of Prisons to understand what treatment the defendant would receive).

The Court did not deny Boutte due process at his sentencing hearing.

## IV.     Conclusion

For these reasons, the Court DENIES Boutte's Motion for Release Pending Appeal (Doc. 424).

IT IS SO ORDERED.

Entered for the Court
this the 30th day of June, 2023

/s/ Joel M. Carson III
Joel M. Carson III
United States Circuit Judge
Sitting by Designation